The grand jury of Geneva County indicted appellant for the capital murder of L.D. Sizemore who at the time of his death was the Sheriff of that county.
The indictment was brought under the provisions of Section 13-11-2 (a)(5), which reads as follows:
 "(5) The murder of any police officer, sheriff, deputy, state trooper or peace officer of any kind, or prison or jail guard while such prison or jail guard is on duty or because of some official or job related act or performance of such officer or guard."
Omitting the formal parts the indictment alleges:
"Count 1
 "The Grand Jury of said County charge that before the finding of this Indictment, Clyde Cade, unlawfully and with malice aforethought killed L.D. Sizemore, a sheriff, to-wit: the Sheriff of Geneva County, Alabama by shooting him with a gun or pistol,
"Count 2
 "The Grand Jury of Geneva County, Alabama further charge that before the finding of this indictment, Clyde Cade, unlawfully and with malice aforethought killed L.D. Sizemore, a sheriff to-wit: the sheriff of Geneva County, Alabama, because of an official or job related act or *Page 804 
performance of such officer, to-wit: the arrest of the said Clyde Cade, by shooting him with a gun or pistol,
"Count 3
 "The Grand Jury of Geneva County, Alabama, further charge that before the finding of this indictment, Clyde Cade did murder a sheriff, to-wit: L.D. Sizemore, the sheriff of Geneva County, Alabama, because of an official or job related act or performance, to-wit: investigating a complaint involving the said Clyde Cade, against the peace and dignity of the State of Alabama."
Appellant filed a motion for a psychiatric examination, alleging that he was unable to understand the proceedings against him and properly assist in his own defense. Following an evidentiary hearing, the Geneva County Circuit Court granted appellant's motion, ruling that he be examined at Searcy Hospital "for such length of time as is necessary to determine the mental condition of the defendant so far as it respects his criminal responsibility or competency to stand trial."
In compliance with the court's order, an examination of appellant was conducted. Officials at Searcy Hospital returned the following report to the court:
"October 21, 1977
"Honorable P.B. McLauchlin, Jr., Judge
"Circuit Court of Geneva County, Alabama
"Geneva, Alabama 36340
"RE: CADE, Clyde
Our File # 11 29 45
"Dear Judge McLauchlin:
 "We are writing with reference to Clyde Cade reportedly a 49 year old separated black male who was admitted to Searcy Hospital for the first admission September 14, 1977 under your commitment order dated the 13th day of September, 1977 with information that he was ordered committed to the State of Alabama, Department of Mental Health for such length of time as necessary to determine the mental condition of the defendant so far as it respects his criminal responsibility or competency to stand trial. It was further ordered that the officials of Searcy Hospital place Clyde Cade under observation and examination with the view of determining the mental condition of the defendant and the existence of any mental disease or defect which would affect his present criminal responsibility or his criminal responsibility at the time of the commission of the alleged crime.
 "Post-admission evaluation, including physical examination, mental status examination, social history study, psychological examination, psychiatric evaluation and neurological evaluation, has been completed and we are submitting the following report of our findings.
 "Psychological examination revealed an intellectual functioning level that falls within the low average range. Testing suggested some socio-cultural and educational deprivation and possible organicity. Mild deficits were noted in general information, vocabulary and comprehension. Memory, reasoning and abstraction were in the average range. Mild retardation was noted on tasks requiring visual-motor coordination. Testing for organicity revealed mild to borderline neurological deficits probably stemming from a history of trauma to head. Despite these mild deficits, the examiner reported that the patient has adequately compensated and his psychological functioning is not significantly impaired. Projective tests were suggestive of hostility, emotional liability and acting out tendencies. The examiner reported there was not much evidence for thought disorder or psychotic type of thinking disturbance. However, the examiner reported that the patient does show distrustful attitudes, and persecutory ideas and feels victimized. Personality data revealed a self-centered, passive-aggressive rebellious individual who apparently failed to learn socialized behaviors from earlier mistakes. Emotionally the examiner described the patient as shallow, immature and unpredictable. The examiner states that the patient feels easily slighted and may react with *Page 805 
violence when his adequacy is threatened. The examiner states that the patient's capacity for guilt and remorse seems limited and that he is likely to project blame on others for his problems. His social judgment and insight into difficulties were thought to be less than adequate. His major defense mechanisms were denial, projection and acting out. Overall profile was suggestive of antisocial personality disorder with superficial passive-aggressive features. Due to the characterological nature of his coping, the examiner reported that prognosis is very guarded.
 "Initial psychiatric evaluation revealed speech to be fairly low, fairly clear and of moderate speed. His affect was somewhat theatrical, labile and very euphoric. No aberrations of thought were evident although the patient stated that he hears voices and he said that this scares him and then he laughed broadly and glanced about the room, according to the report of the examiner. Reality contact appeared fairly good. Associations appeared quite tight and the patient appeared in control although there was profuse tangential verbal output. Sensorium appeared clear. Monetary calculations were fairly slow. Memory in general appeared to be extremely good as the patient gave explicit details but these were not corroborated. Proverb interpretations were fairly good. The examiner stated that it was very difficult to assess his insight at the time of the initial interview. Judgment by history was described as poor. Intellectual capacity appeared average or above although there was thought to be some socio-cultural deprivation. Diagnosis was deferred at the time of the initial evaluation and it was recommended that we refer the patient for a complete organic work-up. "Neurological evaluation revealed a normal EEG and a normal skull x-ray. The neurological consultation impression revealed little evidence of any type of memory problem, according to the consultant neurologist. The consultant also reported that he was very skeptical that this man has any kind of post concussive syndrome which might account for actions which he would not remember and/or be responsible for. He states this is based on the fact that he does not have a good clinical picture for seizures, that he is having a spell every day but no seizure has been observed by the staff, and the fact that his EEG was so normal as to be called "normal normal" rather than just plain normal.
 "Subsequent psychiatric evaluations were conducted October 6, 1977 and October 13, 1977. In the last evaluation it is reported by the consultant psychiatrist that the evaluating team has not been able to find any significant physical or organic problems in this patient and that the patient has shown normal and consistent reasoning and judgment. It is further reported that the patient appears to have fairly good recent and remote memory of all with adequate temporal sequence and that he also has good social awareness demonstrated here. A diagnosis of anti-social personality with superficial passive-aggressive features has been made.
 "Considering the above mentioned evaluation procedures, it was the opinion of the consultant psychiatrist in collaboration with the treatment team that Clyde Cade is sane, is mentally competent to stand trial, knows the difference between right and wrong and is able to cooperate and communicate with counsel in his defense. Therefore, he should be remanded to the legal authorities for further disposition of his pending charge.
 "Our evaluation being complete, we are requesting that appropriate orders be issued to remand Clyde Cade to the custody of the Geneva County Sheriff's Department.
 "With regard to Mr. Cade's criminal responsibility at the time of the commission of the alleged crime, we cannot make any definitive statement as this report reflects our evaluation from the time he was admitted to this hospital.
"Yours very truly, *Page 806 
"THE SEARCY HOSPITAL
 /s/ Kay McLeod, ACSW (Miss) Kay McLeod, ACSW Director of Unit Administration
"APPROVAL: /s/ Jaime E. Condom, M.D.
 Jaime E. Condom, M.D., Superintendent
 "/s/ Schwarzauer "cc: Sheriff, Geneva County, Alabama Geneva, Alabama"
On the basis of this report, observation and conclusions the trial judge ruled him competent to stand trial.
Appellant next filed a motion to quash the indictment on the ground that the grand jury was illegally drawn through a method intentionally excluding persons on account of race, sex, or income. Accompanying this motion were requests that the jury venire be quashed and that the jury rolls be produced for examination. These motions were subsequently withdrawn.
Appellant also filed a demurrer to the indictment and a further motion to Quash the Indictment. These motions are set out below.
"DEMURRER TO INDICTMENT
 "Comes now the defendant and demurs to the indictment heretofore returned him in this cause, and as grounds for said demurrer sets out and assigns the following, separately and severally:
 "1. No facts are averred in Count 3 of the indictment as to how and by what means the alleged murder was done.
 "2. No facts are averred to show that the alleged conduct of the defendant was unlawful.
 "3. No facts are averred in Count 3 of the indictment to show that the alleged conduct of the defendant was unlawful.
 "4. No facts are averred to show that the alleged conduct of the defendant was done with malice aforethought.
 "5. No facts are averred in Count 3 of the indictment to show that the alleged conduct of the defendant was done with malice aforethought.
 "6. No facts are averred to show that the official or job related act or performance was an official or job related act of the offices allegedly murdered.
 "7. No facts are averred in Count 3 of the indictment to show that one official or job related act or performance was an official or job related act of the offices allegedly murdered.
"8. The indictment does not state an offense.
"9. Count 3 of indictment does not state an offense.
 "10. The averments of the indictment are unclear, uncertain, and indefinite.
 "11. The averments in Count 3 of the indictment are unclear, uncertain, and indefinite.
 "12. The indictment does not apprise the defendant of the charge against him.
 "13. Count 3 of the indictment does not apprise the defendant of the charge against him.
 "14. The time of the alleged offense is not averred in the indictment.
 "15. The time of the alleged occurrence on which the charge made in the indictment is based is not alleged in the indictment.
 "16. The place of the alleged offense is not averred in the indictment.
 "17. The defendant is not sufficiently apprised of the charge against him to enable him to defend against it.
"18. The indictment is unconstitutionally vague.
 "19. The indictment does not state facts in such a manner as to enable a person of common understanding to know what is intended.
 "20. The indictment does not charge an offense in the words of any penal statute.
 "21. The averments of the indictment are not sufficiently definite to inform the defendant of what he should be prepared to defend against him.
 "22. The averments in Count 3 of the indictment are not sufficiently definite to inform the defendant of what he should be prepared to defend against.
 "23. The indictment does not identify the offense charge. *Page 807 
 "24. The indictment in Count 3 does not identify the offense charge.
 "25. The indictment is not sufficiently definite and clear enough to enable the Court to pronounce judgement and pass sentence.
 "26. The indictment does not meet the constitutional tests of clarity and definiteness.
 "27. The indictment is not sufficiently specific in its averments to enable the defendant to prepare his defense.
 "28. The indictment is not sufficiently specific in its averments to foreclose the possibility of the defendant being placed in jeopardy for the same offense.
 "29. The indictment is not sufficiently specific as to protect the defendant from being again charged and placed in jeopardy for the same offense.
 "30. The indictment does not contain sufficient information to enable the defendant to reasonably understand the nature of the offense.
 "31. The indictment does not sufficiently inform the defendant of the nature of the charge against him.
 "32. The indictment does not set out the elements of any criminal offense.
 "33. The indictment in Count 3 does not set out the elements of any criminal offense.
 "34. The indictment does not set out the elements of the offense charged against the defendant.
 "35. The indictment in Count 3 does not set out the elements of the offense charged against the defendant.
 "36. The indictment is null and void because the statute upon which Counts 2 and 3 are based is unconstitutional under the Alabama and United States Constitution, specifically the Eighth Amendment and the due process, equal protection and privileges and immunities clauses of the Fourteenth Amendment to the United States Constitution, and Sections 6, 7 and 15 of the Alabama Constitution of 1901."
* * * * * *
"MOTION TO QUASH INDICTMENT
 "The defendant above named, by and through his attorney, Myron H. Thompson, moved to quash the indictment on the grounds that:
 "1. The statute (specifically Title 15, Section 342 (3), et seq., Code of Alabama 1940, Recompiled 1958) upon which Counts 2 and 3 of the indictment are based, is in derogation and violation of the 8th and 14th Amendments to the United States Constitution and Sections 6, 7 and 15 of the Alabama Constitution of 1901, for the following reasons:
 "(a) The provisions of the statute inflict cruel and unusual punishment upon the defendant.
 "(b) The provisions require a mandatory imposition of the death penalty by the jury.
 "(c) The provisions do not provide an opportunity for the jury to consider aggravating and mitigating circumstances.
 "(d) The provisions do not provide the jury with an opportunity to participate in the penological phase of the criminal proceeding.
 "(e) The provisions do not provide for a comparative appellate review of death sentences to insure that such punishment is not grossly disproportionate to the crime.
 "(f) The death penalty is not a deterrent to the homicide allegedly committed by defendant, particularly because the mental incompetency of the defendant deprives him of the ability to conform his conduct to the requirements of the law.
 "(g) Because the defendant is mentally deficient and cannot conform his actions to the requirements of the law, the death penalty as applied to him is so totally without penological justification, in that it results in the gratuitous inflection of suffering.
 "(h) The statute as applied results in the discriminatory and arbitrary application of the death penalty."
Following the filing of these motions, appellant requested a change of venue, which was granted. The case was transferred to Dale County, Alabama. *Page 808 
Appellant then filed additional grounds for a demurrer to the indictment. They are set out below.
"ADDITIONAL GROUNDS OF DEMURRER TO INDICTMENT
 "Comes now the Defendant and for additional grounds of demurrer to the indictment in this cause sets out and assigns the following, separately and severally:
 "37. The indictment in Count I attempts to charge the Defendant with first degree murder, for which he could not be sentenced to death or to life imprisonment without parole, and in which lesser offenses could be included, and the indictment in Counts II and III thereof attempts to charge the Defendant under Chapter II of the Code of Alabama, 1975, with offenses for which death or life imprisonment without parole could be the only sentences, and which would not include any lesser offenses.
 "38. The offense charged, or attempted to be charged in Count I of the indictment, and the offenses charged, or attempted to be charged in Counts II and III of the indictment cannot be included in the same indictment.
 "39. The indictment does not aver any aggravating circumstances as required by Section 13-11-2, Code of Alabama, 1975.
 "40. Count III of the indictment does not charge the Defendant with murder in the first degree under circumstances as set forth in Section 13-11-2 [a](12), Code of Alabama, 1975.
 "41. Count II of the indictment does not charge the Defendant with murder as required by Section 13-11-2 [a](5), Code of Alabama, 1975.
 "42. The indictment does not charge the Defendant with any of the offenses enumerated in Section 13-11-2, Code of Alabama, 1975.
 "43. The indictment is so vague and ambiguous that the Defendant is unable to determine whether he is charged with an offense for which the death penalty or life imprisonment without parole could be inflicted, or some lesser crime."
The trial judge sustained the demurrer as to Counts I and III and overruled the demurrer to Count II of the indictment. Appellant's motion to quash the indictment was denied. Additionally, appellant's request to be examined by a psychiatrist of his choosing at state expense, which was included in his motion for psychiatric examination, was denied.
Finally, appellant filed an additional motion to quash the indictment and an additional demurrer, both identically worded. The text of the motions in substance is set out below.
 "1. The indictment as returned by the Grand Jury contains a misjoinder of offenses.
 "2. The indictment as returned by the Grand Jury is duplicitous.
 "3. The indictment as returned by the Grand Jury contains a misjoinder of offenses, in that Count I is for first degree murder, and Counts II and III are for offenses for which the Defendant can be sentenced to death.
 "4. The action of the trial court in sustaining the Defendant's demurrer to Counts I and III of the indictment and overruling Defendant's demurrer as to Count II results in an arbitrary and capricious selection of an offense for which the Defendant could be sentenced to death, when the Grand Jury had also included in the indictment a Count in first degree murder for which the Defendant could not be sentenced to death.
 "5. The action of the Grand Jury in returning an indictment containing both a Count in first degree murder and a Count setting forth an offense for which the Defendant can be sentenced to death (murder of a Sheriff because of an official or job related act or performance of such Sheriff) results in a delegation of authority to the trial judge or to the District Attorney to make a selection as to which Count the Defendant will be tried under, contrary to law and the Defendant's constitutional rights.
 "6. The Grand Jury cannot delegate its authority to decide whether the Defendant *Page 809 
will be tried for an offense for which he could be sentenced to death or for an offense for which he could not be sentenced to death.
 "7. The actions of the trial court result in an arbitrary and capricious decision that Defendant will be tried for an offense for which he can be sentenced to death when the Grand Jury also charged the Defendant with an offense for which he could not be sentenced to death.
 "8. The inclusion of a Count of first degree murder and a Count of murder of a Sheriff because of an official or job related act or performance of such Sheriff in the same indictment is contrary to the Alabama Death Penalty Statute and to the constitutional rights of the Defendant.
 "9. The inclusion of a Count in first degree murder and a Count of murder of a Sheriff because of an official or job related act or performance of such Sheriff in the same indictment is contrary to the spirit of the Alabama Death Penalty Statute and the constitutional rights of the Defendant."
The Court's order on these motions is set out below.
 "Comes the defendant, Clyde Cade, in his own proper person and through his attorney and files an additional demurrer to the indictment and an additional motion to quash the indictment and the demurrer and motion to quash having been submitted to the Court and the Court having considered the same and each ground thereof, the Court finds as follows:
 "1. That the Grand Jury of Geneva County preferred a three count indictment against the defendant which alleged the following:
 "(a) Count I. Clyde Cade unlawfully and with malice aforethought killed L.D. Sizemore, a sheriff, to wit: the Sheriff of Geneva County, Alabama, by shooting him with a pistol.
 "(b) Count II. Clyde Cade unlawfully and with malice aforethought killed L.D. Sizemore, a sheriff, to wit: the Sheriff of Geneva County, Alabama, because of an official or job related act or performance of such officer, to wit: the arrest of Clyde Cade, by shooting him with a pistol.
 "(c) Count III. That Clyde Cade did murder a sheriff, to wit: L.D. Sizemore, the Sheriff of Geneva County, Alabama, because of an official or job related act or performance, to wit: investigating a complaint involving the said Clyde Cade.
 "2. That Title 13-11-2, Code of Alabama, (1975) states as follows:
 "(a) If the jury finds the defendant guilty, it shall fix the punishment at death when the defendant is charged by indictment with any of the following offenses and with aggravation, which must also be averred in the indictment and which offenses so charged with said aggravation shall not include any lesser offenses.
 "(5) the murder of any police officer, sheriff, deputy, state trooper, or peace officer of any kind, or prison or jail guard while such prison or jail guard is on duty or because of some official or job related act or performance of such officer or guard.
 "3. That on September 7, 1977, the defendant filed demurrers to the indictment and that the demurrers were sustained as to Count I and III of the indictment; that the demurrers were overruled as to Count II of the indictment and the defendant was arraigned and put to trial on Count II of the indictment.
 "4. That the allegations set out in Count I characterized the aggravating circumstances as follows: killed L.D. Sizemore, a sheriff, to wit: the Sheriff of Geneva County, Alabama; that this language substantially followed the language of Title 13-11-2 (a), (5) of the above statute; that if the statute is broken down in sections according to the placing of the word `or', the statute would read as follows: the murder of any sheriff, ...........; the murder of a prison or jail guard while such prison or jail guard is on duty; the murder of any sheriff,. . . . , prison or jail guard because of some official or job related act or *Page 810 
performance of such officer or guard. This Court was of the opinion that in order to sufficiently express the aggravating circumstances in the indictment the Grand Jury not only had to allege that the deceased was a sheriff, but that he was on duty and murdered because of a job related act or performance. Therefore, the demurrer was sustained as to Count I in that it did not sufficiently state or express the aggravating circumstances even though if the statute is read as set out above the circumstances would be sufficiently alleged. In other words, the Court read the first section of the clause (5) with the last section of clause (5) and found that both had to be expressly averred before the aggravating circumstances were sufficiently set out.
 "5. That the Court sustained the demurrer to Count III on the grounds that it failed to set out any means by which L.D. Sizemore was killed, that is by shooting him with a gun or pistol and that the Court was of the opinion that the essential common law of elements of first or second degree murder should be alleged rather than merely using the word `murder'.
 "6. The Court overruled the demurrer as to Count II and the defendant was arraigned on Count II and proceeded to trial on Count II of the indictment.
 "7. That Count II of the indictment sufficiently alleges an offense and the aggravating circumstances as set out in Title 13-11-2, Code of Alabama (1975) and that said offense so charged with aggravation did not include any lesser included offenses.
 "8. There is no question, in this Court's opinion, that in all three counts, the Grand Jury attempted to charge the defendant with the offenses and with aggravation as set out in Title 13-11-2, Code of Alabama, (1975) and the fact that certain counts of the indictment failed to so allege such offenses does not render the entire indictment demurrable and subject to motion to quash when one count of the indictment is sufficient to apprise the defendant of what he is charged with.
 "9. This Court further finds that the Alabama Death Penalty Statute does not prohibit a multi-count indictment where in first degree murder and first degree murder for which the defendant can be sentenced to death are joined in separate counts in the same indictment. The requirement is that defendant must be charged in the indictment with one of enumerated offenses and with aggravation; the aggravation must be averred in the indictment; and the offense so charged with aggravation shall not include any lesser offenses. The offense as set out in Count II did not include any lesser offenses and did apprise the defendant of what he was charged with and the punishment therefor.
 "10. That if Count I is considered as a count alleging first degree murder without any attempt to allege aggravating circumstances and it is joined with a count setting forth an offense with which the defendant could be sentenced to death, this in itself does not make the action of the Grand Jury contrary to the law of Alabama or repugnant to the Constitution of the United States. In Gregg v. Georgia, 428 U.S. 153, 49 L.Ed.2d 859, 96 S.Ct. 2909, the Supreme Court held that opportunity for discretionary actions that are inherent in the processing of a murder case does not render the statute or the procedure unconstitutional. The fact that the state prosecutor has unfettered authority to select the person with whom he wishes to prosecute for a capital offense and to plea bargain or that the jury may convict the defendant of a lesser included offense does not render the procedure or the statute unconstitutional.
 "Therefore, it is ORDERED AND ADJUDGED that the additional demurrers to the indictment are overruled and the additional motion to quash is denied.
"This the 13 day of March, 1978."
At arraignment, in the presence of appointed counsel, appellant entered pleas of not guilty and not guilty by reason of insanity to the charge against him. The trial *Page 811 
court ordered that appellant be provided a copy of the list of names of the persons constituting the venire for trial and that he be supplied a copy of the indictment.
The jury found appellant guilty and fixed his punishment at death. The trial court conducted a sentencing hearing following the trial and adjudged appellant guilty, sentencing appellant to death. A summary of the evidence at trial, the evidentiary sentencing hearing, and the trial judge's written findings following that hearing are set out below.
C.L. Rayburn testified that he was a Toxicologist III for the Department of Toxicology in the area of death investigation. His employment began in 1962 and since that time Rayburn participated in over 2,000 autopsies. Educational qualifications for Rayburn included a Bachelor of Science degree from Auburn University, in chemistry and bio-chemistry, a Master's degree in Toxicology with a minor in pharmacology, and medicinal studies in requirement for a Ph.D. Rayburn did not specify the area in which the Ph.D. was to be earned.
On the night of August 3, 1977, Rayburn received a call to come to Geneva, Alabama. He arrived there at 1:00 a.m. the morning of August 4. At that time Rayburn performed an autopsy on the body of L.D. "Red" Sizemore at the Pittman Funeral Home in Geneva.
Rayburn's examination of Sizemore's body revealed five or possibly six gunshot wounds. Testimony concerning the recovery of projectiles and their path through Sizemore's body is set out below.
 ". . . . I removed from the body four projectiles, or bullets, and portions of a fifth. I found a projectile entered on the left side of the face in front of the left ear. This projectile, or bullet, passed downward and toward the rear. It went beneath the cranial cavity beneath the brain, and struck the first neck vertebra; or neckbone. At that location it severed the spinal cord, then passed rearward into the soft tissues — muscle tissues into the back of the neck, from whence I recovered it. I found another projectile entered on the left-front of the face through the lower jaw; or mandible. It passed in an upward direction going through the teeth and the left-front of the face, also extracting some of the teeth on the upper jaw, and then exited through the upper lip, making a laceration below the nose. The projectile then entered the nose on the right side, and exited the nose. In that case, I got small portions of metal; or portions of the projectile both from the bone on the left side of the jaw, and also from around the upper lip, in the jaw area. I also found a projectile entered below the mandible below the lower jaw on the left side, more to the rear, away from the front, and posterior to the one I just described. It passed through the soft tissues beneath the jaw. It passed through the tongue, then also it struck some of the teeth on the right side; upper portion of the jaw, then entered the right cheek bone from whence the projectile was recovered in the right cheek area. I also found a projectile entered on the left side of the neck just above the shoulder area. It passed through the soft tissues of the neck, and entered on the right-bottom portion of the brain. It passed through the portion of the brain in an upward direction toward the right top of the head, frontal area, where I noted a raised and red contused looking area on external examination. The projectile struck the bone inside, protruded the bone outward, and then ricocheted toward the top middle of the brain, from whence the projectile was recovered. I also found a projectile entered the left shoulder; upper portion of the left arm on the outside area. The projectile passed through the soft tissue of the bone — I mean the arm on front of the bone, it exited in front of the left armpit area, then reentered the left chest in this left armpit, or axilla area. It passed through the soft tissues of the left chest, struck the left 4th rib; where it fractured the rib, the bullet then continued through the soft tissues beneath the skin and external to the rib cage, and *Page 812 
the sternum or breast bone, to the right-front of the neck, where on external examination there was a red and bruised or contused and swollen area. Examination revealed a projectile to be located in that area, and from that area it was recovered. In addition, either a sixth projectile, or one of the five which I just described, struck two fingers of the left hand. It passed on the back of the second knuckle, the left index finger which reflected an injury. It also went in and out of the second knuckle of the left middle finger. I believe, sir, that consisted of the wounds I found on the body both on dissection and external examination."
In Rayburn's opinion Sizemore died from a massive central nervous system trauma to the brain, spinal cord and hemorrhage associated with the gunshot wounds to the body. The projectiles removed from Sizemore's body were given by Rayburn to criminalist John McDuffy.
John McDuffy testified that he was a criminalist with the Alabama Department of Toxicology and Criminal Investigation. McDuffy's qualifications included a Bachelor of Science degree in chemistry from Emory University and a Ph.D. in chemistry from Auburn University. Additionally, McDuffy trained at the Alabama Department of Toxicology and Criminal Investigation under the direction of Chief Toxicologist Dr. C.J. Rehling and Carl Rayburn, Assistant Director.
During the early morning hours of August 4, 1977, McDuffy received some projectiles from Rayburn. Subsequently, he received a pistol, containing six spent cartridges, from criminalist Dale Carter. Ballistics tests run on this weapon determined that two projectiles recovered from Sizemore's head and neck were fired from this weapon. Other projectiles were too mutilated for comparison to test-fired projectiles. A projectile subsequently received from Dale Carter was also determined to have been fired from the weapon McDuffy tested. Swabs taken from a subject's hands revealed the presence of lead, barium, and ammonia, indicating that a weapon had been discharged or handled recently by that person.
McDuffy testified further that the projectiles recovered from Sheriff Sizemore's body were taken in his presence at the funeral home.
Dianne Butts testified that she saw appellant at her house on August 3. With her were her children and her nieces and nephews. Appellant opened the door to the house and asked where Dianne's sister, Shirley, was. Ms. Butts told appellant that he could not come in because Shirley was not at home. When told this, appellant replied, "I'm going to kill her," opened a pocketknife, and was pushed outside the door by Ms. Butts. Appellant then began pulling on a window screen outside. Ms. Butts threw a drink bottle through the window, shattering the glass and striking appellant.
Ms. Butts' sister then returned. Appellant, holding a "piece of board", said he was going to knock out the windshield of the car if Shirley did not get out of it. Ms. Butts told her sister to go get the police and Shirley left the scene, returning shortly thereafter.
A short time later Sheriff Sizemore drove up and talked with Ms. Butts. Following this conversation, the Sheriff called to appellant. From the record:
 "Q. All right. He called Clyde out of the house. How did he do that?
 "A. He just said, `Come here, Clyde', and Clyde come on out saying, `I ain't going nowhere. I ain't going to jail, I ain't going to jail.' And Clyde was leaning against the police car, with his hands on the hood just like that there (witness indicating), and Sizemore said, `Turn around and let me search you', and Clyde said, `I ain't going to jail, I ain't going to jail', so he did just like that there, and started searching Clyde, and went in his pockets and stuff, and after he got through, he said, `Clyde, you're under arrest,' and Clyde said, `I ain't going to jail.' He searched him and opened the car door, and about that time, Clyde grabbed him *Page 813 
around the waist and they fell. The next thing I know, Clyde had came up with the gun, and he had — he told him to leave, and Sizemore throwed up his hands and said, `Okay, I give up.' He got in the car and about that time, the next thing I know there were some shots.
"Q. All right. Who said they `give up'?
"A. Sizemore say he give up.
"Q. And he got in the car?
"A. Yeah.
"Q. And then you heard the shots?
"A. Yes, sir.
"Q. Did you see who had the gun?
"A. Yeah, Clyde had the gun."
After the shooting, appellant left, but returned some time later. Opening the passenger door to the Sheriff's car, appellant told the Sheriff if he moved he was going to kill him. The Sheriff was already dead. Then appellant threatened to kill Ms. Butts if she did not "get Shirley." Deputy L.C. Thomas arrived at the house at this time and appellant snapped the gun at him. Appellant then ran out of the house through the back door. He ran to his house where he was later apprehended.
On cross-examination, Ms. Butts testified that she smelled whiskey on appellant when he attempted to gain entrance to her home. When Sheriff Sizemore arrived at the house, appellant was in the kitchen. When appellant came out of the house, Ms. Butts testified, from the record,
 "A. He come out the house saying `I ain't going no damn where. I ain't going back to jail, I ain't going to jail, I ain't going no damn where.' Just like that right there."
Dale Carter testified that he was a criminalist and the Director of the Enterprise Laboratory for the Alabama Department of Toxicology and Criminal Investigation. On August 4, 1977, Carter removed a spent projectile from the passenger door of Sheriff Sizemore's car. On the third of August, 1977, Carter was given a pistol by Jimmy Hand who was an Investigator from Geneva County. Carter marked down the serial number of the weapon on a receipt which he gave to Hand. This weapon was later turned over to McDuffy.
Shirley Johnson testified that she was Dianne Butts' sister. On the day Sheriff Sizemore was shot, Ms. Butts picked her up when she got off work at the Daleville Inn, at approximately 2:30 p.m. When she got home, appellant was down at Red Brockton's store where her mother's car was being worked on. Ms. Butts and Shirley towed the car home and Clyde rode with them on the hood of the car. Subsequently, Ms. Johnson returned to the store and, when she returned, appellant was at her sister's house. When Ms. Johnson went over to her sister's house, appellant tried to hit the car with a board. At this time Ms. Johnson went to L.C. Thomas' house and returned. Ms. Johnson went inside the house when her sister told her to get out of the car, and appellant followed her, after a brief struggle out in the yard. There they remained until Sheriff Sizemore arrived.
Ms. Johnson was standing in the kitchen door when the appellant went outside in response to Sheriff Sizemore's call. Ms. Johnson's further testimony substantially corresponded to that of Dianne Butts.
Willie May Key testified that she was the mother of Dianne Butts and Shirley Johnson and that she knew the appellant. On the day Sheriff Sizemore was shot, Mrs. Key first saw the appellant at Red Brockton's store, when her car was towed there. When her car was towed home, appellant rode on the hood of it. Mrs. Key did not see the appellant again until Sheriff Sizemore drove up. At that time, watching from her kitchen, Mrs. Key saw appellant approach the sheriff at his car and force him to the ground. Appellant rose up with the sheriff's gun and then Mrs. Key "saw blood and . . . started hollering, so that's it."
L.C. Thomas testified that he was a part-time auxiliary deputy sheriff for the Geneva County Sheriff's Department. On August 3, 1977, Thomas received a complaint about appellant from Shirley Johnson. As a result of this Thomas relayed the complaint to the Sheriff's Office. At some *Page 814 
later time Thomas was informed that Sheriff Sizemore had been killed by appellant. Thomas then drove to the Key house, parking behind the Sheriff's car. Appellant was standing at the car pointing a pistol at Thomas. When Thomas approached Sheriff Sizemore's car, appellant ran around the back of the Key home. Thomas did not see appellant again until he was put under arrest.
Frankie Lindsey testified that he was Chief Deputy for the Geneva County Sheriff's Department. About ten minutes till seven o'clock on the evening of August 3, 1977, Lindsey received a call to proceed to the Key community. When Lindsey arrived at the Key home, he recognized Sheriff Sizemore's car parked out front and L.C. Thomas standing beside it. Lindsey approached the car and saw Sheriff Sizemore slumped over the front seat.
At this time, Lindsey saw appellant standing by Dianne Butts' home and told him to stop; that he was under arrest. Appellant turned around and escaped through some woods in back of the house. Lindsey next saw appellant when he was brought out of his house by other law enforcement officers.
On cross-examination, Lindsey testified that he had arrested appellant on three occasions in which drinking was involved. While appellant had not acted normal at those times, neither had his conduct been strange. Lindsey was not aware of any warrant issued for appellant's arrest other than the one for Sheriff Sizemore's murder. At the time of appellant's arrest for the shooting, appellant was cursing but he said nothing further after he was put in a police vehicle. After he was put in jail Lindsey went to see him and was present when his rights were read to him.
Wade Garrett testified that he was employed by the Alabama Bureau of Investigation as a latent fingerprint examiner. Garrett's qualifications included training in fingerprint classification at the State Police Academy from which he graduated, five years of classification and identification training from J.B. Jolly, a former State Identification officer, and three years of advanced training in latent fingerprint work from R.G. Whitten, a present identification officer with the Bureau.
On August 4, 1977, Garrett took appellant's fingerprints and examined an automobile that had the Geneva County Sheriff's emblem on it. At that time Garrett lifted latent prints from the windows of that car. A print in what appeared to be blood was lifted from the inside of the passenger door window, six inches from the top and ten inches from the back side of the window. Garrett compared this print with a sample taken by him from appellant and discovered nineteen characteristics common to the two prints. In Garrett's opinion the print left on the Sheriff's car was that of appellant, "and could have been left by no other finger."
Allen Benefield testified that he was Chief of the Ozark Police Department. On the evening of August 3, 1977, Benefield received a call to go to the aid of an officer, and proceeded to Geneva County along with Captain Murray Franks and Lieutenant John Nocholson. After arriving at the scene of Sheriff Sizemore's death, a young black female led Benefield and three other officers to appellant's home. These law enforcement officers surrounded the house and called appellant to come out. They called him several times identifying themselves as officers. When the officers received no reply, but heard movement from the living room, they entered the house and found appellant lying down in a bedroom. A revolver lay underneath his head. After securing the weapon, which held six expended cartridges, Benefield turned it over to Deputy Jimmy Hand of the Geneva County Sheriff's Department.
On cross-examination, Benefield testified that appellant appeared to be intoxicated, noting that he had to be gotten onto his feet by officers. Benefield further testified that appellant was bleeding from his face at the time he first saw him.
Dr. William H. Rudder testified that he received a medical degree from Birmingham Medical School in 1952, interning in *Page 815 
Mobile City Hospital through 1953, when he established a general practice in Jackson, Alabama. In 1970, Rudder undertook a residency in psychiatry in Birmingham, completing the program in 1973. Subsequently, Rudder was employed at Veterans Hospital in Tuscaloosa, Bryce Hospital, engaged in private practice and became a Staff Psychiatrist at Searcy Hospital. At the time of his appearance in court, Rudder had been on the "legal Unit" at Searcy for four years. During his work at Searcy, Rudder evaluated several hundred criminals, including the appellant. Appellant was diagnosed as an antisocial personality with superficial passive aggressive features. The definition of this personality disorder utilized by Rudder follows. From the record:
 ". . . . I could — I would like to read what the book, or what I call the catalogue says about an antisocial personality. I think its definition of passive aggressive is a little confusing but I'll read that too if you would like to hear it, but we just said he was antisocial with superficial passive aggressive features, and that's the best short description we could come up with. 301.7; antisocial personality, `The term is reserved for persons who are basically unsocialized and whose behavior pattern brings them repeatedly into conflict with society. They are incapable of significant loyalty to individuals, groups, or social values. They are grossly selfish, callused, irresponsive — irresponsible, impulsive, and unable to feel or learn from their experience and punishment. Frustration tolerance is low.' They don't tolerate frustration very well. `They tend to blame others, or offer pausable rationalization for their behavior. A mere history of repeated legal or social offenses is not sufficient to justify this diagnosis.' Passive aggressive is very short, it is No. 301.81, it is new to this book, this book changes every now and then because we realize it is not totally adequate and we try to improve it. Passive aggressive personality; `The behavior pattern is characterized by both passivity (I guess everybody knows what passivity is, it's just inactivity or not being assertive, or not being aggressive) by both passivity and aggressiveness. The aggressiveness may be expressed passively, for example, structionism, pouting, procrastination, intentional inefficiency, or stubbornness. This behavior commonly reflects hostility which the individual feels he dare not express openly.' We very frequently do that to our parents or someone who is related to us, that we cannot tell directly what our true feelings are. `Often the behavior is one expression of the patient's resentment in failing to find gratification in a relationship with an individual or institution upon which he is over dependent.'"
Further, Dr. Rudder expressed the following opinions on appellant's mental condition. From the record:
"Q. All right. What is your diagnosis of Mr. Cade?
"A. Antisocial personality.
"Q. All right. Does that mean that he's mentally ill?
"A. No. That's a personality disorder.
 "Q. Do you think, based on your observations and consultations and all that you have described, that he was insane at the time of the commission of the crime, and at the time that he shot the Sheriff?
 "A. In my opinion he wasn't insane, but I wasn't there. I don't know what his condition was, and it's my — it's our opinion, and we see people all the time that we feel both ways, you know, and all we can do is have an opinion. It was my opinion, and it was all of our opinions that he was sane at the time.
"Q. That was the board's decision?
"A. Right.
 "Q. Well, was the board's thinking that he was under extreme — was he under the influence of extreme mental or emotional disturbance at the time he committed the crime?
 "A. Well, that's a relative thing. I get emotionally disturbed and everybody in the court has been emotionally disturbed, but there is no indication on everything we could find out; and we found out a *Page 816 
good bit about this man, that he had any more inclination to pull a trigger than any other person. There is no reason to believe that he lacked control or that he was more impulsive. I would say that he is not more impulsive, because he — I don't know how the courtroom would stack up, but there are probably some impulsive people in here who would break a vase or do something like that. There is nothing in his psychological makeup to indicate that he had a degree of impulsivity which would render him unable to control, or unable to recognize the consequences of his acts.
 "Q. Now, do you think, in your expert opinion, that he had the capacity to appreciate the criminality of his act, or to conform his conduct to the requirements which was substantially impaired?
"A. Would you repeat that?
 "Q. All right. Do you think that he had the capacity to appreciate the criminality of his conduct on the occasion when he shot the Sheriff, or to conform his conduct to requirements of law?
"A. I think he had the capacity. That's my opinion.
 "Q. All right. Do you think that he was under an irresistible urge at the time that he committed the crime?
 "A. I don't think he was under irresistible urge. That's my opinion.
 "Q. Do you think that he was sane at the time that he committed this act?
"A. It's my opinion that he was sane.
 "Q. Do you think that he knew the difference between right and wrong, and that he appreciated the criminality of the conduct at the time?
 "A. It's my opinion that he did know the difference between right and wrong, and could appreciate the criminality of his conduct.
 "Q. In other words, he had the ability to choose the right from the wrong?
"A. Yes."
Dr. V. Kothandapani testified that he was a native of India and that he obtained a bachelor's degree and master's degree in psychology in his country. In 1970 Kothandapani earned a Ph.D. degree in psychology at the University of North Carolina in Chapel Hill. After that time, Kothandapani held positions at Franklin College in Indiana and in private practice. At the time of his appearance in court concerning the case at bar, Kothandapani had worked at Searcy Hospital for two years, evaluating persons with criminal charges against them. Including appellant, Kothandapani evaluated approximately two hundred to two hundred and fifty such persons in those two years.
Dr. Kothandapani performed eleven different evaluation tests upon appellant. On the basis of his testing and experience, Dr. Kothandapani formed the following opinion. From the record:
 "Q. All right. Based on your tests and experience and talking with him, do you think he was insane at the time he committed this crime of shooting the Sheriff?
 "A. Now, this is something we — I have to give an educated guess, because as you know pretty well, I was not at the scene of the crime. Even if I were there, I would never know, because what goes on in another man's head is really difficult to assess. But, from the testing data, from the facts, from the interview I had with the patient, and from seeing hundreds of criminals, and also capital murder cases, I would say that the person acted violently and that he was aware of the — he was aware of what he was doing because of the personality features. I'm basing it on the personality features. So, if I were to take an educated guess, if I were to give an expert opinion on this regard, it would be that he was not insane at the time this happened — this alleged crime happened.
 "Q. All right. Now, based further on your testing, do you think he was under the influence of extreme mental or emotional disturbance at the time he committed the crime?
 "A. Again, this would be in terms of my educated guess, or expert opinion, that he would have been under some emotional distress. Any time you get into a fight; even a simple street fight, your emotions *Page 817 
are aroused, you become angry, but the extent to which it goes, the intense emotion that we are talking about, does not qualify for what you just now said. He is not that emotionally disturbed as to — as not to know what he was doing.
 "Q. Well, do you think his capacity to appreciate the criminality of his contact — conduct, or to conform to the requirements of law were substantially impaired at the time he committed this crime?
 "A. I don't think it was substantially impaired. Again, based on the personality data, I would say that it was not the capacity to appreciate the criminality of the offense — was not substantially impaired.
 "Q. Do you think he was under an irresistible urge to do that which he did when he committed this crime?
"A. I don't think so.
 "Q. All right. Now, based on your experience and knowledge in this field, would you say that Clyde Cade was sane at the time he shot the Sheriff?
"A. In all probability, yes.
 "Q. And do you think he knew the difference between right and wrong at the time that he did that?
"A. In all probability, yes.
 "Q. And do you think that, even though he did know right from wrong, that he could have chosen right from wrong at the time he committed this crime?
"A. I think so."
Larry D. Baxter testified that he was a police lieutenant in Enterprise, Alabama. On August 3, 1977, Baxter proceeded to the Key community, arriving there at approximately 7:30 p.m. Baxter and other law enforcement officers conducted a search for appellant and found him in an unpainted wood frame house two or three-tenths of a mile away from the scene of Sheriff Sizemore's death. After surrounding the house, and getting no reply from appellant when summoning him out of the house, Baxter entered the house, finding appellant lying on a bed, a pistol lying under the left side of his face. Baxter put appellant under arrest, reading him his "rights." Appellant appeared to have been drinking, but he was not "stumbling drunk."
Jimmy Hand testified that he was a drug investigator for the Geneva County Sheriff's Department. On August 3, 1977, Hand went to the Key house, arriving there at approximately 7:00 p.m. From there, Hand accompanied Chief Benefield, Baxter, and other law enforcement officers to appellant's house. After appellant's arrest, Chief Benefield gave him a revolver which was recovered from appellant. Hand testified that he subsequently gave this weapon to Dale Carter after initialing it. Hand's testimony concluded the State's case.
Out of the presence of the jury, appellant moved to exclude the State's evidence on the ground that a prima facie case had not been established. Additionally, appellant argued that the State's evidence failed to show that Sheriff Sizemore could not have legally arrested the appellant. From the record:
 "MR. HUGHES: Now, the State put in the indictment the allegations that the official act of the Sheriff was making the arrest of Clyde Cade. There has been testimony from a Chief Deputy that there was no warrant for the arrest; or none that he knew of, and that he was familiar with the records. There has been no proof of anything that would justify an arrest without a warrant. L.C. Thomas testified that he simply called someone, and that the jailor, trustee, or someone at the jail told him that there was a disturbance at the Key residence — or the Key community. There is no evidence at all about how the Sheriff got the information. There is no evidence to indicate that Clyde Cade did anything in the Sheriff's presence. The rule being, of course, that to justify an arrest without a warrant for a misdemeanor, it must be committed in the presence of the officer. On the contrary, the evidence was clear that Clyde Cade was in the house, and that the Sheriff called him out and told him that he had to come with him. The girls testified that he told him that he was under arrest, but Clyde had done *Page 818 
nothing in his presence. The evidence is that nothing had been reported to the Sheriff. Even if we wanted to stretch a point, nothing had been reported to the Sheriff that would justify an arrest. We feel, of course, that the indictment contemplates a lawful arrest. If it was not a lawful arrest, then the Sheriff was not acting within the line and scope of his duties as a Sheriff, in the going up and making of an unlawful arrest. We feel that even though the girls have said that he told him he was under arrest, that there was no basis for a legal arrest, and that would have to be contemplated in the indictment, and that there is a fatal variance in this regard."
The court denied appellant's motion to exclude the evidence.
Appellant testified that he was either thirty-nine or forty-nine years of age, and that he had lived in Coffee Springs as a child. After getting "lost" a few times appellant was discharged from military service under honorable conditions. At one time, appellant had been restricted to a military hospital at Fort Rucker. This occurred after going "AWOL" over some trouble in Quincy, Florida. From the record:
"Q. What kind of trouble was it?
 "A. Well, I got in a misfortune there with a guy over shooting pool, and some other things that he said, and messed around and done something to him. I wound up down in the county prison camp.
"Q. What did you do to him?
 "A. Well, they say I messed him up, I don't know if I did or not.
 "Q. Well, did you beat him up, or did you kill him, or what did you do?
"A. So they say, I don't know.
"Q. What do they say?
 "A. They is some say I killed him, some say I beat him up, I don't know if I did or not, you see.
"Q. Do you remember anything about it?
 "A. Well, my last recalling of it — the shooting game at the pool table, you know — I used to be pretty good at shooting pool. The guy come to me and he said, `Well, you done won all my money. Give me some of my money back.' I said, `You get to the table to win my money?' He said, `Yeah.' Then I said, `Well, it went a little different, I won it.' And he said, `You ain't going to give it back to me?' and I said, `Uh-huh.' Then he made the remark that I had took his money and I had took his woman also. Then he got to describing the womens to me, you know, — two womens at the time, that I had been with that night, you know, that he was getting at me about. So, he got to calling the names, and this particular girls that he said was Shirley. Well, I know she was on my car that night.
 "Q. Are you talking about the Shirley that was here and testified?
"A. That's right.
"Q. And this was down in Quincy, Florida?
"A. That's right.
"Q. All right.
 "A. And so he opened a knife at me, and I kept jabbing him with that pool stick until I got him to one of the windows. I kept jabbing and he fell out the window. Well, I didn't realize that we was upstairs, you know, so I went back to shoot pool.
 "Q. He fell out of the upstairs window? "A. Yeah, that's right. So all of a sudden, officers come and arrested — you know, asked if we was having a disturbance up there, and everybody pointed their finger over at me."
Appellant further testified, all on direct examination, that he had several other prison terms for various "trouble" he had been involved in. These offenses included theft and leaving the scene of an accident.
On the day Sheriff Sizemore was killed, appellant remembered having sat on David Key's porch. He also remembered speaking with L.C. Thomas that morning. There was a disagreement over money which appellant believed Thomas owed him for some work he had done. *Page 819 
Appellant also testified that he had been in an automobile accident. From the record:
 "Q. About how long ago? About how long prior to the time that the Sheriff was killed?
 "A. In other words, I don't know, but it was before he fired me. It was before he fired me, I think.
"Q. Before he fired you?
"A. Yeah.
"Q. Were you hurt in any way in the wreck?
 "A. Well, to tell you the truth, I just never could get myself together after that — that jar or something done something to me.
"Q. Well, did you get hit by anything, or did your —
 "A. I ram up against that truck part there, and up that steering wheel and all, up there in my face, and hit this other truck.
"Q. How did the accident happen?
 "A. Well, coming around a curve there by Wyley (PHON) Road — a pretty stiff curve, and you can't see around it no —
 "Q. Clyde, I don't really mean all the details of it, but did you run into another vehicle?
"A. We both run head-on.
 "Q. All right. Now, you say it bumped you against some parts of the truck and the steering wheel. What part of your body hit what part of the truck or the steering wheel?
 "A. Mostly here; it hit me up beside the head there a little too, and I never was able hardly to get back to myself. It upset me some way or another there.
"Q. In what way?
 "A. In other words, I got where I would go in places and I wouldn't know nothing about it. I would find myself sometimes walking in the rain down that railroad over there, and I don't know."
In addition to this injury, appellant testified that he had been in other accidents and that he had received other head injuries, mostly during fights, from "folks been bumping (him) about the head . . . ." Every morning appellant took a teaspoon of "yellow root and gin" to dull the pain he had in his head.
Appellant knew Sheriff Sizemore "quite a while." On several occasions the Sheriff had arrested appellant for drunkenness. Appellant described one of these arrests. From the record:
"Q. What were those arrests for?
 "A. Well, mostly it would be drinking. So one time he arrested me — I think he was Deputy then, and he come to arrest me down there at Bellwood one time in a little old cafe down there. So moonshine was in the progress pretty good then, and I was hauling it and doing everything else, and making it too. So D.T. walked up to me and said, `Well, Clyde you ain't drinking, that's the first time.' I said, `No, sir.' And he said, `Well, there is a time when everybody quits,' and he said, `Yeah, I'm going to mark that down when I get back that you ain't drunk.' So, he just walked off the —
"Q. That was D.T. Braxton (PHON)?
 "A. That's right. And about that time, Mr. Sizemore come up and looked at me, and — well, the words you see, I wouldn't like to say them among these people here. But he said, `Yeah, hell, you drunk.' And I said, `No, I ain't neither.' And he slammed the handcuff on that arm, you know, and I said, `Man, what's a matter with you? And I said that, and he reached and got his old `whip stick,' you know, to whip me with. He hit me a couple of times and I took it away from him.
"Q. He hit you with a stick?
 "A. That's right. So, if it hadn't been for Mr. D.T., he probably would have blowed my head off then. He told me to my face then — `I'm going to tell you just like he said it; excuse me for saying it, but I'm going to tell you just like he said it. He said, `You're one damn nigger that if I ever get the chance, I'm going to kill you.' So I remembered that, and every time I would get around him, he would refresh my memory of this thing. *Page 820 
I got to where I wouldn't hardly go to town — wouldn't hardly go to my mother's on that account."
According to appellant, Sheriff Sizemore told him similar things on several occasions. However, appellant remembered few of the circumstances surrounding the fatal incident. From the record:
 "Q. Did you get into a squabble up there with Dianne Butts?
"A. I don't remember that either.
 "Q. Do you remember picking up this two-by-four, or whatever it was, and trying to knock the —
"A. No, I don't.
 "Q. All right. Do you remember when the Sheriff came up there?
 "A. I remember him calling me, and I walked out to the car where he was, and it just seemed like it was a dream — like I just could hardly see him.
 "I believe I was out there on that porch with my head down. I might have been in the place with my head down. But I had my face in my hands and somebody kept calling me. I looked up there and there was a car with a blue light on it, and I got —
"Q. Was the light on?
 "A. No, it wasn't on, it was just on top of the car. And I walked out there where he was, and I walked up to the car to see if it was him. So, he said, `Clyde, what the heck you doing up here raising hell?' I said, `Raising hell? How in the world could I be raising hell with all these young ones around here? He dropped his hand like that, and I was wondering what he was doing with it. I looked back at the house to see if anybody was looking, because I knowed what he said he was going to do to me.
"Q. Did he say anything else to you then?
 "A. That's the last I remember after he dropped his hand and I turned back and looked at the house, and when I went to turn back, he hit me in the mouth, and I don't remember nothing else.
"Q. He hit you in the mouth?
 "A. Yeah, that's how come my mouth is messed up right there. (Indicating mouth)
"Q. What did he hit you with?
 "A. I don't know. It seemed like he must have hit me with that old gun or something, because he just `Boom!' like that, and that's the last I remember.
"Q. Now, you say you remember hearing somebody call?
"A. That's right.
"Q. And you went out there to the Sheriff's car?
"A. Yeah?
* * * * * *
 "Q. Did he ever tell you — do you remember him telling you that you were under arrest?
"A. I don't remember him saying them words to me.
 "Q. Do you remember him telling you that you had to come with him?
"A. I don't remember him saying that.
 "Q. All right. After he hit you, what's the next thing you remember?
 "A. Actually I just remember — I just don't remember that — it seemed like I stepped out the back door of David's house and looked at that tater house —
"Q. Looked at what?
 "A. That tater house back there; a thing that he had made to keep Irish Potatoes in. And I looked at it and I don't remember nothing else from there.
"Q. Is that the only thing you remember?
 "A. Yeah. That night, or somewhere, I remember somebody dragging me from somewhere — off of some porch."
In conclusion, appellant testified that he remembered nothing about shooting Sheriff Sizemore.
Pastoria Cade testified that she was the mother of appellant and that he was thirty-nine years old. Appellant was not normal at the time of birth, having no mouth. Mrs. Cade "Clipped him a mouth" with a safety razor blade. Nor did appellant have a normal childhood, often flying "off the handle." These spells usually occurred once a month. *Page 821 
Mrs. Cade further testified that she had known Sheriff Sizemore since 1960 or earlier. On occasion, Sizemore had made threats against appellant, telling Mrs. Cade and her husband that "He (appellant) is one nigger he was going to kill."
Dr. Fernando Lopez testified that he was a practicing psychiatrist in Dothan, Alabama. Lopez became a physician in Lima, Peru, in 1958, and interned in Iowa. Having received psychiatric training at the University of Minnesota and the University of Missouri from 1960 to 1963, Lopez was "board certified in Psychiatry to practice psychiatry of high quality in the United States."
On March 2, 1978, Lopez examined appellant in his office in Dothan, Alabama. At that time Lopez had a copy of a report on appellant compiled at Searcy Hospital. Following is Lopez's opinion of appellant's mental condition.
 "Q. Doctor, will you tell the jury your findings concerning Clyde Cade's mental condition, based upon your examination and the report of Searcy Hospital?
 "A. All right. In reviewing the social history, the medical findings, the neurological findings, the psychological findings, the psychiatrist's opinion in this report, and my psychiatrist interview, I come to the conclusion that this fellow; Mr. Cade, has a sociopathic personality problem, and in law terms, as they mention here, an anti-social personality. That's the way that he's been functioning for life. On top of this problem, his personality, he has had numerous traumatic sequations; meaning physical injury, to his body and to his brain; accidents, being hit in the head, and the most important one is alcohol consumption. This man has been drinking for many years, maybe 28 or 30 years. We know in Psychiatry and medical science that alcohol will destroy brain cells. It will damage the brain to the point that these people; like Mr. Cade shows, will become more impulsive, lose control of their emotions quicker, more irritable; they are more liable to change very quick. They could be laughing for no reason, or smiling, or getting angry, and they don't have control of it. They have memory problems, they become more forgetful, and they use poor judgment. These characteristics that I have mentioned to you; we Psychiatrists call it an `organic brain syndrome.' In this case, it is organic brain syndrome associated with alcoholism. This is nothing to do with the personality. As I said, people with this brain damage, it could be mild, light mild, severe, and have this kind of mental functioning that I described to you; the memory, the forgetfulness, poor judgment, and labile affect. You can see all of these, and I have found all of these in Mr. Cade.
 "Q. Doctor, based upon your findings, I'll ask you a question that has to assume certain things, and I would like for you to listen to it very carefully if you will.
"A. Yes, sir.
 "Q. Assuming that Clyde Cade has, in fact, the personality disorders as testified to; that is, the
 anti-social personality disorder with superficial passive-aggressive features as contained in the report of Searcy Hospital, together with mild neurological deficits, and assuming further that a white Sheriff has told him that if he ever has to arrest him again that he will kill him, and assuming further that Clyde Cade has consumed enough alcohol on the occasion to be classified as `intoxicated', and further, assuming that upon direct confrontation of Clyde Cade by this Sheriff, he is struck in the mouth by the Sheriff, and assuming further that Clyde Cade takes a gun from the Sheriff and shoots him six times, in your medical judgement, would Clyde Cade be acting in response to an irresistible impulse?
"A. Yes, sir.
 "Q. Based upon those assumptions, would he be, in your opinion, functioning at that time with a diminished mental ability or control?
"A. Yes, sir.
 "Q. And based upon your examination and the examination of Searcy Hospital, *Page 822 
does he have any control over those actions under those circumstances?
"A. No, sir, he doesn't."
During cross-examination, Lopez testified that he personally interviewed the appellant for thirty-five minutes. Further, appellant could discern right from wrong and adhere to the right if he were sober. Nor did Lopez disagree with the Searcy report findings on appellant's condition.
In rebuttal, David L. Key testified that he was the father of Shirley Johnson and Dianne Butts. Within a month prior to Sheriff Sizemore's death, appellant made a statement to Key concerning the Sheriff.
From the record:
"Q. What did he say?
 "A. He said that, `Mr. Red wasn't going to carry him down no more, that he would kill him', or something or another like that, you know.
 "Q. Well, to refresh your recollection, was the statement, `Before Mr. Red carries me to jail again, he's going to have to kill me or I'm going to kill him?'
"A. That's right.
"Q. Is that what he said?
"A. That's right.
"Q. Had he been drinking?
"A. No, sir, not at the time."
Key's testimony concluded the evidence heard in the case. Following argument by counsel, the court's oral charge, and deliberation, the jury returned the following verdict:
 "THE COURT: Ladies and Gentlemen of the Jury, is the verdict of the Jury that I hold in my hand?
"JURORS: (All responding) Yes.
 "THE COURT: `We the Jury, find the Defendant, Clyde Cade, guilty of unlawfully and with malice aforethought killing L.D. Sizemore; a Sheriff, to-wit: the Sheriff of Geneva County, Alabama, because of an official job related act of the officer, to-wit: the arrest of said Clyde Cade, by shooting him with a gun or pistol, and affix the Defendant, Clyde Cade's punishment at death.' Signed, `Curt Segler', foreperson."
After the jury was polled, each juror proclaiming the verdict as his own, the trial court adjudged appellant guilty and set a date for a sentencing hearing. Appellant was also informed of the automatic appeal of his conviction.
At the sentencing hearing the State presented in evidence a pre-sentence report for an arrest of leaving the scene of an accident in 1976. The chronological history of appellant's arrests from that report is set out below:
 "10-11-58 Geneva, Alabama Public Drunkenness $10.00 Fine "8-28-59 Raiford, Florida Breaking and Entering 18 months "11-21-61 Geneva, Ala. Grand Larceny (Auto) Nolle Prossed "11-21-61 Geneva, Ala. Burglary 13 months "11-19-62 " " Grand Larceny 3 years "11-19-62 " " Assault to Murder Nolle Prossed "7-6-66 " " Assault to Murder No Bill "11-2-68 " " Disposing of Property Covered by Lien "4-3-69 " " Removing Mortgaged Property "8-14-70 " " Highway Intoxication "9-21-70 " " Public Drunkenness "12-30-70 " " Alias Public Drunkenness "5-1-71 " " Reckless Driving $25.00 Fine "5-1-71 " " No Driver's License $10.00 Fine "10-16-72 " " Fraudulent Check $100.00 Fine *Page 823 
"1-20-73 " " Drawing Dangerous Weapon Not guilty
 "7-27-73 " " Public Drunkenness "7-27-73 " " Assault on Police Officer "11-16-73 " " Fraudulent Check "11-16-73 " " Alias Public Drunkenness "8-10-74 " " Fraudulent Check $50.00 Fine "9-30-74 " " Alias Fraudulent Check released "1-25-75 " " Burglary Pending in Circuit Court "3-26-75 Enterprise, Ala. Destroying Personal Property Nolle Prossed "3-26-75 " " Destroying Personal Property " " "7-4-75 Geneva, Ala. Public Drunkenness $5.00 Fine "8-3-75 " " No Tag $10.00 Fine "8-3-75 " " No Driver's License $10.00 Fine "8-16-75 " " Public Drunkenness $10.00 Fine "9-6-75 " " Driving While Revoked $25.00 Fine "9-6-75 " " Reckless Driving $25.00 Fine "9-6-75 Geneva, Ala. Switching Tag $10.00 Fine "9-6-75 " " Failing to Yield to Emergency "9-13-75 " " Willfull failure to appear $10.00 Fine "9-13-75 " " Willfull failure to appear $10.00 Fine "10-3-75 Enterprise, Ala. Bond Forfeiture Nolle Prossed "11-27-75 Geneva, Ala. Destroying Personal 60 days Property "1-31-76 " " Fraudulent Check Willfull failure to appear "2-18-76 Enterprise, Ala. Leaving Scene of Accident Probation "4-5-76 Geneva, Ala. Fraudulent Check Alias $50.00 "4-18-76 " " Disturbing the Peace Pending"
Additionally, the State presented a report prepared by the Board of Pardons and Paroles, dated November 28, 1961, detailing the appellant's burglarization of a store in Geneva County; and the reports concerning prior offenses.
The State also presented a statement taken by Steve Weekley, an investigator for the Department of Public Safety, from Willie Allen Bryant, deceased prior to trial.
That statement is set out below:
"Date — 8-9-77
"Time — 9:55 p.m.
 "Location — Route 1, Box 117, Chancellor
"Residence — Mae Pearl Horace
 "Witness — Willie Allen Bryant (Peter Rabit)
 "On August 3, 1977 between 5:30 p.m. and 6:30 p.m. I was standing in Mae Pearl Horace's front yard. I heard several gun shots coming from the direction of David Lee Key's house. I was by myself in the front yard. I went to the edge of the yard and looked toward the Key house with Mae Pearl Horace. I saw L.C. standing behind his car with a rifle or shotgun telling Clyde to `Come on out and give himself up.' I heard him call Clyde by name. Mae Pearl went back into the house. I stayed at the edge of the yard looking toward the Key house. When I started to the house Clyde Cade was standing between me and the house. *Page 824 
Clyde ask me for some cartridges (bullets). I told him I did not have any. He said he was going to kill Dick Key and his daughters. Clyde then turned and left walking in the road back toward the Key house. That is the last time I saw Clyde Cade. He had blood all over his face when I talked to him. It looked like his lip was busted. This is a true and correct statement.
"Witness: Mae Pearl Horace
"his mark X ________________
"Statement taken by: Steve Weekley"
Appellant presented no evidence. However, he argued that his severe emotional and personality problems should mitigate the imposition of the death penalty. Additionally, appellant again noted that the State presented no evidence of a lawful arrest of appellant by Sheriff Sizemore.
After the hearing of the evidence and argument of counsel, the court made the following written findings:
 "This being the date set for a hearing in accordance with law to determine whether or not the Court will sentence the defendant to death or to life imprisonment without parole after the following jury verdict was rendered on the 15th day of March, 1978: `We, the Jury, find the defendant, Clyde Cade, guilty of unlawfully and with malice aforethought killing L.D. Sizemore, a sheriff, to-wit: the Sheriff of Geneva County, Alabama, because of an official or job related act of such officer, to-wit: the arrest of said Clyde Cade, by shooting him with a gun or pistol and fix the defendant, Clyde Cade's punishment at death.'
 "And the defendant, Clyde Cade being present, in open court at this hearing with his attorney, Honorable Joseph Hughes and the state being represented by the Honorable Edward Boswell, District Attorney, and W.B. Mattews, Assistant District Attorney.
 "And evidence and argument having been presented to the Court relevant to the sentencing of Clyde Cade, including matters relating to the aggravating and mitigating circumstances enumerated in Title 13-11-6 and Title 13-11-7 of the Code of Alabama, 1975.
 "And the Court having considered all of the evidence presented at the trial of this cause which was started on March 13, 1978 and completed on March 15, 1978. "The Court finds from the evidence that Clyde Cade was guilty and is guilty of killing L.D. Sizemore, the Sheriff of Geneva County, Alabama because of an official or job related act, the arrest of the defendant, by shooting him with a pistol; "The Court further finds that the defendant, Clyde Cade, shot L.D. Sizemore, the Sheriff of Geneva County with a pistol; that as a result of the shooting, L.D. Sizemore died; that the killing was willful, deliberate, malicious, and premeditated; that these four elements co-existed before and at the time Clyde Cade killed L.D. Sizemore; that the offense constituted first degree murder of L.D. Sizemore;
 "The Court further finds that at the time of the murder, L.D. Sizemore was the Sheriff of Geneva County, Alabama; that he was performing an official or job related act of arresting Clyde Cade as a result of Clyde Cade committing an offense in L.D. Sizemore's presence or as a result of his threatening to breach the peace in his presence;
 "The Court further finds that this Capital felony of first degree murder was committed for the purpose of avoiding or preventing a lawful arrest, and
 "The Court further finds that this Capital felony was committed to disrupt or hinder the lawful exercise of a government function of the enforcement of the law. The evidence showed that L.D. Sizemore was the Sheriff of Geneva County, Alabama; that Clyde Cade was creating a disturbance in the Key Community; that a complaint had been made to the Geneva County Sheriff's office concerning the disturbance being created by Clyde Cade in the Key Community; that shortly after the complaint was made, L.D. Sizemore arrived at the scene of the disturbance in the Key Community in Geneva *Page 825 
County, Alabama; that Clyde Cade was disorderly, threatening and boisterous in the presence of the Sheriff; that Clyde Cade assaulted the Sheriff and shot him five times while he was unarmed and sitting in his patrol car; that at the time, L.D. Sizemore, the Sheriff of Geneva County, Alabama, was functioning as he is required to do under the laws of the State of Alabama: that is, investigating complaints, making an arrest for breaches of the peace, threatened in his presence or offenses committed in his presence and protecting other citizens from the disorderly, threatening and boisterous conduct of the defendant and from the defendant's conduct in so disturbing the peace on the property of the Keys without the owner, occupants, or others who have the authority, consenting to the said conduct on their property; that the Sheriff was enforcing the law by arresting Clyde Cade, who was unlawfully preventing the Keys from being able to peacefully enjoy and use their home through his threatening, disorderly and boisterous conduct on the property of the Keys for which they had immediate right to possession of to the exclusion of Clyde Cade; that L.D. Sizemore was doing at the time that which he was elected to do by the citizens of Geneva County and that is protecting the life and property of law abiding citizens from unlawful intrusions on their persons and property by anyone conducting himself as Clyde Cade was on this occasion,
 "The Court further has considered all of the testimony concerning the diminished responsibility of the defendant, his state of mind at the time of the killing, his degree of intoxication, his mental competency, the circumstances surrounding the killing and whether or not it was done in the heat of passion, and the Court finds that the defendant did not act under extreme duress and that he had the capacity to appreciate the criminality of his conduct and his ability to conform his conduct to the requirements of law was not substantially impaired,
 "The Court, after considering all the evidence in the case and the circumstances of the offense, together with the character and propensity of the defendant, Clyde Cade, and after weighing the aggravating and mitigating circumstances and the punishment of death by the jury, finds that the defendant, Clyde Cade, should be sentenced to death.
"This the 27 day of March, 1978.
 /s/ P.B. McLauchlin, Jr.
P.B. McLauchlin, Jr. Judge, 33rd Judicial Circuit"
At the time, the trial court sentenced appellant to death, appellant having said that he remembered "none of it," and that "part of it was lies."
Appellant first contends that the Alabama Capital Sentencing procedures are violative of due process in that the statute allows the imposition of the death penalty in an arbitrary or capricious manner and that the imposition of the death penalty is standardless. This question has been put to rest in this State, our Supreme Court affirming the constitutionality of Act 213, 1975 Ala. Acts, page 701 et seq., now Sections 13-11-2, et seq., Alabama Code of 1975, in Ex parte Jacobs, Ala.,361 So.2d 640, 1978. Further, in denying Jacobs' application for rehearing on August 11, 1978, the Alabama Supreme Court held that Alabama's sentencing scheme in capital cases comports with the decisions of the United States Supreme Court in Bell v.Ohio and Lockett v. Ohio.
Next appellant argues that Count I of the indictment alleged nothing other than first degree murder; thus, its inclusion with the capital counts resulted in duplicity, and a misjoinder of offenses. Additionally appellant contends that the Grand Jury attempted to delegate its discretion to the trial judge in deciding whether to charge appellant with a capital or a noncapital offense. Therefore the trial judge's sustaining a demurrer to Count I of the indictment was an arbitrary exercise of discretion prohibited by Furman v. Georgia, 408 U.S. 238,92 S.Ct. 2726, 33 L.Ed.2d 346. *Page 826 
In responding to appellant's contentions, we first examine the indictment in view of the rules of criminal procedure. The trial judge's sustaining the demurrer as to Count I eliminated it, and if the indictment, before the demurrer was sustained, was subject to attack for misjoinder, this defect was cured by the trial court's action. Barnett v. State, 16 Ala. App. 539,79 So. 675, cert. denied, 202 Ala. 191, 79 So. 677.
As to the trial judge's sustaining the demurrer amounting to an arbitrary exercise of discretion in deciding whether or not appellant should be prosecuted for a capital crime of a noncapital offense, we do not think that the mandate of Furman, supra, has been controverted. Furman was, in part, the result of the jury's unfettered power to arbitrarily inflict the ultimate sanction on some defendants while merely imprisoning others. Under pre-Furman statutory capital schemes, the death penalty could truly be imposed on a standardless basis.
However, Furman did not proscribe the use of any discretion in cases which could be prosecuted as capital. The control of discretion required by Furman is aimed at the sentencing body. In Gregg v. Georgia, 428 U.S. 153, at 199, 96 S.Ct. 2909,49 L.Ed.2d 859, we find the following language discussing discretionary stages in the Georgia capital punishment scheme:
 "First, the petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. Further, at the trial the jury may choose to convict a defendant to a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict. And finally, a defendant who is convicted and sentenced to die may have his sentence commuted by the Governor of the State and the Georgia Board of Pardons and Paroles.
 "The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. Furman, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." (Emphasis added)
We agree with the trial court that Count I of the indictment attempted to aver the requisite aggravation as found in Section 13-11-2 (a)(5), Code of Alabama 1975, in an insufficient manner. A description of the victim is not required in an indictment for homicide.
Next appellant argues that under the indictment a "legal" arrest of appellant by the victim was necessary to sustain his conviction and that the evidence presented did not establish that appellant's arrest was legal.
Section 15-10-3, Code of Alabama, 1975, provides,
 "An officer may arrest any person without a warrant, on any day and at any time, for:
 "(1) Any public offense committed or a breach of the peace threatened in his presence;
 "(2) When a felony has been committed, though not in his presence, by the person arrested;
 "(3) When a felony has been committed and he has reasonable cause to believe that the person arrested committed it; *Page 827 
 "(4) When he has reasonable cause to believe that the person arrested has committed a felony, although it may afterwards appear that a felony had not in fact been committed; or
 "(5) On a charge made, upon reasonable cause, that the person arrested has committed a felony."
Appellant contends that no offense was ever committed in the presence of Sheriff Sizemore by him. Thus, the State's failure to prove that Sheriff Sizemore had a warrant for appellant's arrest was fatal to the prosecution. While Sheriff Sizemore did not see the behavior of appellant complained of by Dianne Butts and Shirley Johnson, the evidence is clear that after his arrival in the Key community, Sheriff Sizemore observed appellant behaving in an unruly and boisterous manner, using profanity. The Sheriff also had a conversation with Dianne Butts before taking any action. This behavior indicated appellant's purpose to breach the peace and, under the evidence, it was proper to submit to the jury the question of whether Sheriff Sizemore was justified in arresting appellant without a warrant. Price v. McConnell, 250 Ala. 686,36 So.2d 80, and cases cited therein.
In Price v. McConnell, supra, the Supreme Court held:
 "It is the law in this state that a policeman or town marshal may, without warrant, arrest anyone who commits a breach of the peace in his presence, or who, by boisterous conduct, accompanied by violent words or actions, indicates a purpose to commit a breach of the peace . . ."
The office of sheriff is one of ancient origin. Its creation goes back at least to the time of King Alfred of England. The holder of the office has always been the chief executive officer and conservator of the peace in his county. 80 C.J.S. Sheriffs and Constables § 1, and cases there cited. The sheriff certainly has the authority, without warrant, to arrest anyone who commits a breach of the peace in his presence, "or who, by boisterous conduct, accompanied by violent words or actions, indicates a purpose to commit a breach of the peace."
Under the facts in this case, we hold the Sheriff had the power and authority, without warrant, to arrest appellant.
Finally, it is necessary to review the sufficiency of the evidence to sustain appellant's conviction. There is absolutely no doubt that appellant murdered Sheriff Sizemore, the State's evidence tending to show through direct evidence that Sizemore was killed when he attempted to arrest appellant for a threatened breach of the peace in his presence.
The question remains only whether or not appellant was responsible for his acts.
Section 15-16-2, Code of Alabama, 1975, provides:
 "Every person over 14 years of age charged with crime is presumed to be responsible for his acts, and the burden of proving that he is irresponsible is cast upon the accused. The defense of insanity in all criminal prosecutions shall be clearly proved to the reasonable satisfaction of the jury."
The defense of insanity is an affirmative one, the burden of which never shifts to the prosecution. Grammer v. State,239 Ala. 633, 196 So. 268. A verdict of guilty concludes the issue of insanity at the time of the commission of the offense unless a preponderance of the evidence indicates palpable error.Ozforda v. State, Ala. Cr.App., 339 So.2d 1038, cert. denied, Ala., 339 So.2d 1042.
A careful examination of appellant's evidence on this issue, the testimony of Dr. Lopez and the appellant's mother falls short of clearly establishing that at the time of the commission of the crime appellant was afflicted with a diseased mind to the extent that (1) he did not know right from wrong as applied to the particular act in question, or (2) if he did have such knowledge, he, nevertheless, by reason of duress of such mental disease, had so far lost the power to select the right and to avoid doing the act in question as that his free agency was at *Page 828 
the time destroyed, and (3) that, at the same time, the crime was so connected with such mental disease, in relation of cause and effect, as to have been the product of it solely. Parsonsv. State, 81 Ala. 477, 2 So. 854; Hafley v. State, Ala.Cr.App.,342 So.2d 408, cert. denied, Ala., 342 So.2d 412.
We have carefully reviewed the written findings of the trial court at the sentencing hearing as provided by Section 13-11-4, Code of Alabama 1975. The trial court fully complied with the cited section, and its findings and sentence are fully supported by the evidence. We do not find sufficient mitigating circumstances to outweigh the aggravating circumstances to justify an interference with the final judgment and sentence imposed by the trial court. Whatever the range of demonic thoughts that passed through the sadistic mind of the defendant, it appears clear that he intentionally shot and killed Sheriff Sizemore with the pistol that he seized from the Sheriff during the attempted arrest and while the Sheriff was in his car trying to leave the scene. This was a cold, calculated, and deliberate killing of a defenseless officer who was engaged in the performance of his duties as a conservator of the peace.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. Death is the penalty of the law, and the penalty is just. The judgment is in all things affirmed.
AFFIRMED.
All the Judges concur.