[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11459

_____

ROBERT SHAWN INGRAM,

Petitioner-Appellant,

*versus*

WARDEN, HOLMAN CORRECTIONAL FACILITY,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 1:17-cv-01464-LSC

_____

Before JORDAN, BRANCH, and GRANT, Circuit Judges.

JORDAN, Circuit Judge:

When Robert Shawn Ingram was charged in Alabama with the 1993 capital murder of Gregory Huguley, he immediately began cooperating. Acting without an attorney, he secured a plea agreement with the state. He agreed to plead guilty to a lesser charge of murder and receive a parole-eligible sentence of life imprisonment. In exchange, he would testify against his three co-defendants.

After Mr. Ingram obtained counsel, one of the co-defendants convinced him that they would all be acquitted if they remained silent: "Nobody talks, everybody walks." Against the advice of his attorneys, Mr. Ingram refused to perform his part of the plea agreement and testify at the trial of one of his co-defendants. The state then declared the agreement void and tried him for capital murder. The jury found him guilty, and the trial court—following the jury's recommendation—sentenced him to death.

After his conviction and sentence were upheld on direct appeal, Mr. Ingram sought state post-conviction relief. As relevant here, he asserted that his attorneys rendered ineffective assistance by failing to properly advise him about the risks of not following through with his plea agreement and by not doing enough to persuade him to testify against his co-defendant. The Alabama courts rejected this ineffectiveness claim, ruling in part that Mr. Ingram could not show prejudice resulting from his attorneys' conduct.

The district court denied Mr. Ingram's federal habeas corpus petition, concluding that the decision of the Alabama courts was not an unreasonable application of applicable Supreme Court precedent and was not based on an unreasonable determination of the facts. *See* 28 U.S.C. §§ 2254(d)(1)-(2). Following our review of the record, and with the benefit of oral argument, we agree and affirm.

## I

On July 31, 1993, Mr. Ingram and three others—Anthony Boyd, Moneek Ackles, and Dwinaune Quintay Cox—kidnapped Mr. Huguley at gunpoint from a public street in Anniston, Alabama because he had failed to pay $200 for crack cocaine that they had sold to him. *See Ingram v. State*, 779 So. 2d 1225, 1238 (Ala. Crim. App. 1999). Mr. Ingram and his co-defendants took Mr. Huguley to a baseball field in a rural area and, while he was pleading for his life, they "taped him to a bench, doused him with gasoline, set him on fire, and burned him to death." *Id.* Mr. Ingram was a principal actor in the murder—he wielded the gun, used force to effect the kidnapping, poured the gasoline, and lit it with a match. *See id.* After Mr. Huguley had been set on fire, Mr. Ingram and his co-defendants stood around for approximately 20 minutes and watched him burn to death. *See id.*

Mr. Huguley's body was found the next morning. Shortly thereafter, Mr. Ingram and his three co-defendants were identified as having been involved in the murder. Mr. Ingram immediately began cooperating with the authorities and gave a number of statements admitting his involvement in the murder. Mr. Ingram was

then charged with the capital murder of Mr. Huguley during a kidnapping.

## A

Before his trial, Mr. Ingram entered into a self-negotiated plea agreement with the state. Pursuant to the agreement, Mr. Ingram would plead guilty to a lesser-included offense of murder and receive a parole-eligible life sentence. In exchange, he would cooperate with the state's investigation and testify against his co-defendants.

The plea agreement provided that it would become "null and void" if Mr. Ingram did not testify against his co-defendants or failed to cooperate with the state's investigation. Given what later transpired, that language in the agreement proved to have significant consequences.

Mr. Ingram and his co-defendants were incarcerated together at the county jail. During jailhouse conversations, one of the co-defendants, Mr. Ackles—who had not given a statement to the police—convinced the others, including Mr. Ingram, that the state's case against them was weak, and that if they did not testify, none of them would be convicted. Mr. Ackles' advice was simple: "Nobody talks, everybody walks."

Mr. Boyd's trial was the first to go forward. When the time came for Mr. Ingram to fulfill his plea agreement by testifying against Mr. Boyd, he refused. At that time, Mr. Ingram was represented by Jeb Fannin and Mark Nelson, who did not learn of his

decision to not testify until he took the stand on the second day of Mr. Boyd's trial.[1]

Once Mr. Ingram announced his refusal to testify, the trial court gave him the opportunity to meet with his attorneys to discuss his decision to renege on his plea agreement. Mr. Ingram told his attorneys that Mr. Ackles had come up with a plan—if they all remained quiet they would "all go home." He also explained that he did not want to testify against Mr. Boyd because he did not want to be labeled a "snitch"—"you don't last in the penitentiary when you get a label like that." The attorneys advised and urged Mr. Ingram to honor the plea agreement and "explained to him what could happen to him if he did not testify against [Mr.] Boyd—i.e., that he could receive the death penalty." The attorneys also "warned him that one of his [co-defendants] would take the [s]tate's offer if he did not want to take it[.]"

Mr. Ingram, however, was "adamant in his decision" and Mr. Fannin explained that he and Mr. Nelson could not "twist his arm and make him testify." The attorneys told Mr. Ingram that it was his decision whether to follow through with his plea agreement and testify against Mr. Boyd.

---

[1] At the state post-conviction evidentiary hearing, Mr. Ingram testified that he had informed his attorneys ahead of time about his decision to not testify against Mr. Boyd. The state post-conviction court, however, credited the testimony of Mr. Fannin that he and Mr. Nelson first learned of Mr. Ingram's decision at Mr. Boyd's trial.

After Mr. Ingram had an opportunity to meet with his attorneys, everyone appeared before the trial court. One of the prosecutors told the trial court that the state was viewing Mr. Ingram's failure to testify against Mr. Boyd as a breach of the plea agreement. The prosecutor also informed the trial court that the state would try Mr. Ingram for capital murder, that Mr. Ingram had given a "confession" admitting his involvement in the crime, and that the prosecution intended to use his statements against him at trial. Mr. Nelson told the trial court that he and Mr. Fannin had met with Mr. Ingram and had gone "over all the options and all the possible punishments," and that Mr. Ingram said he understood but "did not wish to testify."

The trial court then engaged in a colloquy with Mr. Ingram to ensure that he knew what he was doing and understood the consequences of his decision. The trial court asked him whether he understood that murder carried with it a sentence of life imprisonment with the possibility of parole, while capital murder carried with it either a sentence of life in prison without the possibility of parole or a sentence of death. The trial court also explained that the state was going to view his decision to not testify as a breach of the plea agreement and was going to prosecute him for capital murder.

Mr. Ingram repeatedly said that he understood and maintained that he wanted to exercise his right to remain silent. The trial court specifically cautioned him that he was "deciding [his] fate . . . to some extent" by breaching the plea agreement, and gave him

22-11459               Opinion of the Court                    7

a final chance to change his mind, but he continued to refuse to testify against Mr. Boyd.  The trial court determined that he understood what he was doing and what he was giving up.

At the end of the day, Mr. Ingram did not testify against Mr. Boyd.  As a result, the state rescinded the plea agreement.[2]

The state subsequently tried Mr. Ingram for capital murder.  *See Ingram*, 779 So. 2d at 1237.  The state presented overwhelming evidence of his guilt at trial, and the jury found him guilty.  The jury recommended a sentence of death, and the trial court followed that recommendation.

On direct appeal, the Alabama Court of Criminal Appeals affirmed Mr. Ingram's conviction and death sentence.  *See id.* at 1282–83.  So did the Alabama Supreme Court.  *See Ex parte Ingram*, 779 So. 2d 1283, 1285 (Ala. 2000), *cert. denied*, 531 U.S. 1193 (2001).

**B**

After his direct appeal concluded, Mr. Ingram filed a petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure.  He alleged, in part, that his attorneys had rendered ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and its progeny by failing to properly

---

[2] Mr. Ingram's attorneys proved to be prophetic.  Mr. Cox, one of Mr. Ingram's co-defendants, agreed to testify on behalf of the state and did so at Mr. Boyd's trial.  A jury convicted Mr. Boyd of capital murder and the trial court sentenced him to death.  *See Boyd v. Commissioner*, 697 F.3d 1320, 1325–26 (11th Cir. 2012).  Mr. Cox received a sentence of life with the possibility of parole, and he is no longer in prison.

advise him about the risks of not following through with his plea agreement and by not doing enough to persuade him to testify against Mr. Boyd.

Following a series of appeals and remands, the state post-conviction court held an evidentiary hearing. With respect to the ineffectiveness claim, it heard testimony from Mr. Fannin (one of Mr. Ingram's former attorneys), Mr. Ingram, and several of Mr. Ingram's family members.

Mr. Fannin testified that, leading up to Mr. Boyd's trial, he had hoped that Mr. Ingram would uphold his plea agreement. He explained that he had conversations with Mr. Ingram about testifying against Mr. Boyd. Although he could not specifically remember those conversations from 29 years ago, he said that he "would have made [Mr. Ingram] aware of the evidence and his chances so to speak."

In addition, Mr. Fannin testified that he and Mr. Nelson were not aware that Mr. Ingram was going to renege on his plea agreement until he took the stand at Mr. Boyd's trial. He described how he and Mr. Nelson then met with Mr. Ingram, explained the consequences of his decision, and tried to persuade him to honor the plea agreement. For example, they told him that if he chose not to testify against Mr. Boyd one of his co-defendants would accept the state's plea offer. They also told him he could receive the

death penalty. But they could not "twist his arm and make him testify."[3]

Mr. Ingram admitted that his attorneys had encouraged him to testify against Mr. Boyd, and that they had told him that if he did not, then one of his co-defendants would accept the state's plea offer. But he explained that he refused to testify against Mr. Boyd for two reasons. First, he and his co-defendants had devised a plan to stay silent because they believed that if "everybody be quiet, we all go home." He did not listen to his attorneys because he thought they were "bluffing." Second, he chose not to testify because he did not want to be labeled a "snitch." As he put it, "you don't last in the penitentiary when you get a label like that."

According to Mr. Ingram, if his attorneys had sought out his sister or his aunt to talk to him, he would have listened to them and honored his plea agreement. This testimony was echoed by Mr. Ingram's relatives. Mr. Ingram's aunt testified that the attorneys never asked her for help in persuading him to testify against Mr. Boyd. Had they done so, she would have gone to him and said: "Shawn, listen, and I want you to listen to me good . . . for the sake of your mother and for the sake of yourself, I want you to tell them the truth about what happened." She explained that she believed he would have listened to her because "he's scared of [her]" and because "[h]e's scared he going to get a whooping." Mr. Ingram's older sister similarly testified that she "would have popped him on

---

[3] Mr. Fannin explained that if he thought anyone could have persuaded Mr. Ingram to change his mind he would have sought out that person.

the head, and then . . . told him he needed to do whatever it was to spare his life and to tell the truth."

After the evidentiary hearing, the state post-conviction court issued an order denying Mr. Ingram relief. With respect to the ineffectiveness claim at issue here, the court ruled that Mr. Ingram's attorneys "did all that was constitutionally required of them when they attempted to persuade [Mr. Ingram] to honor his [plea] agreement[.]" The court concluded that Mr. Ingram's attorneys did not render deficient performance because their actions were reasonable—when Mr. Ingram insisted he would not testify against Mr. Boyd, they met with him, advised him of the consequences of his decision, warned him that one of his co-defendants would take the deal offered by the state, and urged him to honor his plea agreement. The court further found that it was not "convinced that there was anything [the attorneys] could have done to persuade [Mr. Ingram] to change his mind." Mr. Ingram was "adamant" that he would not testify against Mr. Boyd because he believed everyone would be acquitted if they all remained silent and because he did not want to be labeled a "snitch." Even when the trial court informed him of the consequences of his decision, Mr. Ingram "insisted that he would not testify."

The state post-conviction court also concluded that Mr. Ingram had failed to prove that his attorneys had failed to enlist his family members to persuade him to honor the plea agreement: "[Mr.] Ingram presented no evidence that, given that his decision to not testify against [Mr.] Boyd occurred in the middle of [Mr.]

Boyd's trial, his family members could have arrived at the courthouse in the short amount of time that [the attorneys] had to meet with [him] to persuade [him] to honor his agreement. . . . Additionally, there was nothing offered at the evidentiary hearing to demonstrate that the trial court would have waited for [Mr.] Ingram's family to arrive to attempt to persuade him to testify against [Mr.] Boyd."

In an unpublished opinion, the Alabama Court of Criminal Appeals affirmed the state post-conviction court's order on the ground that Mr. Ingram had failed to establish prejudice resulting from his attorneys' allegedly deficient performance: "[T]he [state post-conviction] court found that [Mr.] Ingram failed to prove that any of the actions he asserted [the] trial [attorneys] should have undertaken would have made any difference in the outcome." *Ingram v. State*, No. CR-17-0774, slip op. at 13 (Ala. Crim. App. Sept. 13, 2019). Mr. Ingram did not want to be labeled a snitch, and because "serving time in prison was inevitable" it "was reasonable for the [post-conviction] court to conclude that [he] would not have honored his plea agreement regardless of [the attorneys'] actions." *Id.*

## C

Mr. Ingram sought federal habeas corpus relief, but the district court rejected his ineffectiveness claim. It concluded that the Alabama Court of Criminal Appeals made a reasonable determination of the facts when it held that Mr. Ingram could not demonstrate *Strickland* prejudice. Mr. Ingram's contention that his attorneys should have done more to persuade him to testify against Mr.

Boyd failed because it was "based on the pure speculation that, had his [attorneys] more persuasively warned him that he would already be labeled a 'snitch' in prison . . . [he] would have heeded their advice. . . .  The [Alabama] courts were entirely reasonable in finding that, because [Mr.] Ingram testified that he 'never' wanted to be labeled a 'snitch' in prison, nothing his [attorneys] could have done would have changed his mind."  In other words, the prejudice ruling of the Alabama courts was not an unreasonable application of applicable Supreme Court precedent and was not based on an unreasonable determination of the facts.

We granted Mr. Ingram a certificate of appealability on whether his attorneys "rendered ineffective assistance when they failed to properly advise him on the risks of failing to follow through with his plea agreement and the cooperation it required."

## II

"[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Strickland*, 466 U.S. at 698.  "Although a district court's ultimate conclusions as to deficient performance and prejudice are subject to plenary review, we subject underlying findings of fact only to clear error review." *Cade v. Haley*, 222 F.3d 1298, 1302 (11th Cir. 2000).

The Antiterrorism and Effective Death Penalty Act of 1996, which governs this case, provides a further limitation on the availability of habeas relief.  It establishes a "highly deferential standard for evaluating state-court rulings, [and] demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563

U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).  When a state court has adjudicated a claim on the merits, habeas relief is available only if the state court's decision was contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or was based upon an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks and citation omitted).[4]

### III

To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show both that his counsel's performance was deficient and that the deficient performance prejudiced him.  *See Strickland*, 466 U.S. at 687.  Unless a petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."  *Id*.  Generally speaking, to establish prejudice a petitioner must demonstrate "a

---

[4] In some cases, such as those where AEDPA deference is unclear, we can apply traditional standards of appellate review if the result is the denial of relief. This is because "'a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review.'"  *Reese v. Sec'y, Florida Dep't of Corr.*, 675 F.3d 1277, 1291 (11th Cir. 2012) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010)).  *See also Conner v. GDCP Warden*, 784 F.3d 752, 767 n.16 (11th Cir. 2015) ("This Court has previously affirmed the denial of § 2254 relief after conducting *de novo* review without resolving whether AEDPA deference applies.") (citing cases).

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

We may resolve the performance and prejudice prongs "in either order and need not address both when denying a[n] [ineffectiveness] claim." *Clark v. Comm'r, Alabama Dep't of Corr.*, 988 F.3d 1326, 1331 (11th Cir. 2021). Our analysis here begins and ends with the prejudice prong, as Mr. Ingram has failed to establish that he was harmed by his attorneys' allegedly deficient performance.

**A**

In order to prove prejudice, a petitioner who claims that he did not plead guilty and proceeded to trial due to his counsel's deficient performance must establish a reasonable probability that "the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012). Where, as here, "[h]aving to stand trial . . . is the prejudice alleged," the petitioner must show that "but for the ineffective advice of counsel there is a reasonable probability that" he would have accepted the plea offered, that the trial court would have accepted the plea, and that the conviction or sentence (or both) would have been less severe than what ultimately resulted after trial. *See id.* at 163–64.

The ineffectiveness claim in *Lafler* was admittedly somewhat different than Mr. Ingram's—the petitioner there claimed that he had rejected a favorable plea offer due to his counsel's deficient advice that he could not be convicted at trial of assault with intent to murder, while Mr. Ingram contends that he breached the plea

agreement he had signed due to his attorneys' allegedly deficient efforts to persuade him to testify against Mr. Boyd. Despite this difference, we agree with Mr. Ingram that *Lafler* provides the basic framework for evaluating the prejudice prong of his ineffectiveness claim. In both *Lafler* and here the essential contention is that the petitioner did not accept or follow through on a favorable plea offer due to ineffective assistance of counsel and received a more severe sentence after being convicted at trial. The critical question then, adapted from *Lafler*, is whether Mr. Ingram has shown a reasonable probability that he would have honored his plea agreement and testified against Mr. Boyd if his attorneys had done more (i.e., pressured him more effectively to testify, told him in no uncertain terms that he would be convicted of capital murder at trial, and enlisted the help of his family members to convince him to honor his plea agreement).

**B**

Our sister circuits have generally held that a determination that a habeas petitioner or a 28 U.S.C. § 2255 movant would (or would not) have accepted a plea offer or would (or would not) have gone to trial but for counsel's deficient advice and performance constitutes a finding of fact. *See, e.g., Feliciano-Rodriguez v. United States*, 986 F.3d 30, 36–37 (1st Cir. 2021); *United States v. Gonzalez*, 943 F.3d 979, 982–83 (5th Cir. 2019); *United States v. Peleti*, 576 F.3d 377, 382–85 (7th Cir. 2009); *Cullen v. United States*, 194 F.3d 401, 405 (2d Cir. 1999); *United States v. Thompson*, 27 F.3d 671, 675 (D.C. Cir. 1994). We have said the same thing in an unpublished opinion, *see*

*Millan v. Sec'y, Florida Dep't of Corr.*, 663 F. App'x 753, 755 (11th Cir. 2016), and now expressly come to the same conclusion.

As the Second Circuit has persuasively explained, "the determination of the likelihood that [the petitioner] would have accepted the plea bargain if he had been fully informed of its terms and accurately advised of the likely sentencing ranges under the plea bargain and upon conviction after trial [is], like all predictions of what might have been, a factual issue, albeit a hypothetical one." *Cullen*, 194 F.3d at 405. *See also Gonzalez*, 943 F.3d at 982–83 ("Because of conflicting evidence, whether there [is] a reasonable probability that [the petitioner] would have pleaded guilty but for his constitutionally deficient counsel is ultimately a question of fact."). So the determination by the Alabama courts that Mr. Ingram would not have testified against Mr. Boyd no matter what his attorneys did is a factual one.

## C

In our criminal justice system, the decision as to "whether to plead guilty" or "insist on maintaining . . . innocence" belongs to the defendant. *See McCoy v. Louisiana*, 138 S.Ct. 1500, 1508 (2018). The state post-conviction court and the Alabama Court of Criminal Appeals found that there wasn't anything that the attorneys could have done to make Mr. Ingram change his mind, honor his plea agreement, and testify against Mr. Boyd. In other words, they found that, regardless of what more the attorneys might have done, Mr. Ingram would not have testified against Mr. Boyd. This is a factual finding, and even if we were only applying traditional

standards of appellate review it would not be clearly erroneous. *See Cooper v. Harris*, 581 U.S. 285, 293 (2017) ("A finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern.").

At the state evidentiary hearing, Mr. Fannin testified about the discussion that he and Mr. Nelson had with Mr. Ingram after he announced he would not testify against Mr. Boyd. Mr. Ingram told them that "he felt like nobody was going to testify against anybody else." Additionally, Mr. Ingram explained that he was reluctant to testify because he did not want to be labeled a "snitch." Mr. Fannin and Mr. Nelson advised Mr. Ingram that he should honor his plea agreement, but he was "so adamant in his decision" that they could not just "twist his arm and make him testify." Mr. Fannin and Mr. Nelson told Mr. Ingram that if he did not follow through on his plea agreement one of his co-defendants would accept the state's offer and testify. They also warned him that he could receive the death penalty. But Mr. Ingram thought they were "bluffing" and did not follow their advice. This evidence makes the factual finding of the Alabama courts plausible.

Mr. Ingram, of course, testified that he would have honored his plea agreement and testified against Mr. Boyd if only his attorneys had told him that he would undoubtedly be convicted of capital murder at trial and enlisted his family members to get him to change his mind. And his relatives testified that they could have gotten him to honor his plea agreement if only they had been able to speak to him.

Contrary to Mr. Ingram's assertion, *see* Br. for Appellant at 29, the Alabama courts did not fail to consider that evidence. Instead, they did not credit it. For example, as the Alabama Court of Criminal Appeals explained, "[t]he [state post-conviction] court, as the finder of fact, was free to reject [Mr.] Ingram's self-serving testimony[.]" *Ingram*, slip op. at 13. *See Williams v. Smith*, 591 F.2d 169, 173–74 (2d Cir. 1979) (a finding that the defendant would have pled guilty even if he had "been given accurate sentencing information" was a factual one subject to clear error review because it "relate[s] to such intangibles as motivation and intent [and] depend[s] especially upon . . . credibility assessments") (second alteration in original) (citation and internal quotation marks omitted).

As noted, AEDPA places an even higher hurdle for Mr. Ingram when it comes to challenging factual findings made by the Alabama courts. It provides that a "determination of a factual issue made by a [s]tate court shall be presumed to be correct" and that the petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). As we have explained in a habeas case governed by AEDPA, clear and convincing evidence consists of proof that a claim is "highly probable." *Fults v. GDCP Warden*, 764 F.3d 1311, 1314 (11th Cir. 2014) (alterations adopted). And "[t]he credibility of a witness is a question of fact entitled to a presumption of correctness under AEDPA." *Jenkins v. Comm'r, Alabama Dep't of Corr.*, 963 F.3d 1248, 1272 (11th Cir. 2020).

On this record, the Alabama courts' factual finding that Mr. Ingram would not have changed his mind no matter what more his attorneys might have done is entitled to a presumption of correctness. And that presumption has not been overcome by clear and convincing evidence. First, the concern that he would be labeled a "snitch" provided a firm reason for Mr. Ingram refusing to testify against Mr. Boyd, and that concern would not have gone away even if the attorneys tried to exert more pressure. Second, this is not a case in which the attorneys gave Mr. Ingram false hope of an acquittal if he went to trial. They told him that if he did not testify against Mr. Boyd one of his co-defendants would accept the state's plea offer. And they told him that he could receive the death penalty if he proceeded to trial. Nevertheless, Mr. Ingram thought his attorneys were "bluffing" and was convinced that if no one talked, he and his co-defendants would get off "scot-free." Third, even if his attorneys did not sufficiently convey the likely consequences to Mr. Ingram, the trial court told him that if he breached his plea agreement the state would try him for capital murder and use his confession against him. The trial court also told him that he was "deciding [his] fate . . . to some extent" by refusing to testify. Despite these warnings, Mr. Ingram stuck to his decision and refused to testify against Mr. Boyd.

As for the attorneys' alleged failure to seek the help of Mr. Ingram's relatives, the state post-conviction court explained that "[Mr.] Ingram presented no evidence that, given that his decision to not testify against [Mr.] Boyd occurred in the middle of [Mr.] Boyd's trial, his family members could have arrived at the

courthouse in the short amount of time that [the attorneys] had to meet with [him] to persuade [him] to honor his agreement. . . . Additionally, there was nothing offered at the evidentiary hearing to demonstrate that the trial court would have waited for [Mr.] Ingram's family to arrive to attempt to persuade him to testify against [Mr.] Boyd." Mr. Ingram does not offer anything in his brief to challenge these determinations.

In sum, the Alabama courts' factual finding that Mr. Ingram would have refused to testify against Mr. Boyd, no matter what more his attorneys did, stands. And based on that finding, their ultimate conclusion that Mr. Ingram was not prejudiced by his attorneys' allegedly deficient performance—which constitutes a ruling on a mixed question of law and fact—is not unreasonable under § 2254(d)(2). *See Harrington v. Richter*, 562 U.S. 86, 103 (2011) (a state court decision is unreasonable under AEDPA if it is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement").

## IV

We affirm the district court's denial of Mr. Ingram's ineffective assistance of counsel claim for failure to establish prejudice.

**AFFIRMED**.